PENN CENTRAL TRANSPORTATION COMPANY et al., Respondents, v CITY OF NEW YORK et al., Appellants.

First Department, December 16, 1975

*Nina Gershon Goldstein* of counsel *(Stanley Buchsbaum* and *L. Kevin Sheridan* with her on the brief; *W. Bernard Richland, Corporation Counsel),* for appellants.

*John E. F. Wood* of counsel *(John M. Friedman, Jr., Peter H. Jacoby* and *Philip H. Hedges* with him on the brief; *Dewey, Ballantine, Bushby, Palmer & Wood,* attorneys for respondent UGP Properties, Inc., and *White & Case,* attorneys for respondents Penn Central Transportation Company, The New York and Harlem Railroad Company and The 51st Street Realty Corporation), for respondents.

*Louis J. Lefkowitz, Attorney-General (Samuel A. Hirshowitz, Philip Weinberg* and *Barbara Brenneman* of counsel), for State of New York, *amicus curiae.*

*Austin A. Laber (Steven R. Ganfer* of counsel), for Citizens Housing and Planning Council of New York, Inc., *amicus curiae.*

MURPHY, J. Defendants have thus far been more successful, at the appellate level, in repelling a direct frontal attack on the constitutionality of the New York City Landmarks Preservation Law (Administrative Code of City of New York, ch 8-A) than in applying it to a given factual situation. (Cf. *Lutheran Church in Amer. v City of New York,* 35 NY2d 121; *Matter of Trustees of Sailors' Snug Harbor v Platt,* 29 AD2d 376.) A majority of us now feels that the time for its full implementation has arrived.

The specific issue presented in this case is whether, as applied to these plaintiffs, the city's Landmarks Preservation Law and the action of defendants thereunder with respect to certain property commonly known as the Grand Central Terminal are unconstitutional. Trial Term responded affirmatively on the grounds that plaintiffs' private property was taken for public use without just compensation and that they were deprived of due process and equal protection of the laws. We disagree.

In recent years, as we have become painfully aware that "the frontier" has been disappearing and our natural resources are rapidly being depleted, there has been an increas-

ing national growth of interest in preserving irreplaceable buildings and sites which have historical, aesthetic or cultural significance.

These changing attitudes now acknowledge that "[u]rban landmarks merit recognition as an imperiled species alongside the ocelot and the snow leopard. Over fifty per cent of the 12,000 buildings listed in the Historic American Buildings Survey, commenced by the federal government in 1933, have been razed. The threat to the remainder continues undiminished as the recent loss of Chicago's Old Stock Exchange and the precarious status of New York's Grand Central Terminal attest. If this trend is not reversed the nation at its bicentennial in 1976 will mourn the loss of an essential part of its architectural and cultural heritage rather than celebrate the visible evidence of its past." (The Chicago Plan: Incentive Zoning and The Preservation of Urban Landmarks, 85 Harv L Rev 574–575.)

Since 1966 Congress has passed major new laws furthering historic preservation. (See Gray, The Response of Federal Legislation to Historic Preservation, 36 Law & Cont Prob 314.) The National Historic Preservation Act of 1966 found and declared "that the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people". (US Code, tit 16, § 470, subd [b].)

Though "fraught with trouble" *(Lutheran Church in Amer. v City of New York,* 35 NY2d 121, 131, *supra),* the preservation of landmarks in urban areas is of special importance. Great cities have always been havens for educational and cultural activities. New York's rich history is reflective of the great deal of time, money and talent invested in building its own architectural heritage. Structures such as the Brooklyn Bridge, the Metropolitan Museum of Art, the New York Public Library and Grand Central Terminal are important and irreplaceable components of the special uniqueness of New York City. We have already witnessed the demise of the old Metropolitan Opera House (see *Matter of Keystone Assoc. v Moerdler,* 19 NY2d 78) and the original Pennsylvania Station. Stripped of its remaining historically unique structures, New York City would be indistinguishable from any other large metropolis.

Following the evolving national trend, New York City, in 1965, provided for landmark preservation by adding chapter 8-

A to its Administrative Code, pursuant to enabling legislation adopted by the State nine years earlier (former General City Law, § 20, subd 25-a, now General Municipal Law, § 96-a). The council "declared as a matter of public policy that the protection, enhancement, perpetuation and use of improvements of special character or special historical or aesthetic interest or value is a public necessity and is required in the interest of the health, prosperity, safety and welfare of the people"; and established, as the purpose of the chapter, *inter alia:* "the protection, enhancement and perpetuation of such improvements and of districts which represent or reflect elements of the city's cultural, social, economic, political and architectural history", the safeguarding of "the city's historic, aesthetic and cultural heritage", the fostering of "civic pride in the beauty and noble accomplishments of the past", the protection of "the city's attractions to tourists and visitors" and the promotion of "the use of historic districts and landmarks for the education, pleasure and welfare of the people of the city." (Administrative Code, § 205-1.0.)

Briefly stated, the Landmarks Preservation Law provides for the establishment of a commission which, after a public hearing, proposes to the Board of Estimate the designation of landmark properties and historic districts. The board approves, disapproves or modifies the designation after receipt of a report from the City Planning Commission. (Administrative Code, § 207-2.0.)

Once a landmark is so designated it must be kept "in good repair" (§ 207-10.0) and any alteration, construction or demolition of an improvement on the site is regulated. (§ 207-4.0.) Comprehensive procedures are provided for changes. A landmark owner may seek a "certificate of no exterior effect" or, if there will be such exterior effect, a "certificate of appropriateness." (§§ 207-5.0–207-7.0.) There is also a procedure for seeking a certificate of appropriateness on the ground of insufficient return in the case of taxpaying commercial properties; and a similar procedure, but a different form of relief, for certain tax exempt properties used for charitable purposes. (§ 207-8.0.)

Related to the Landmarks Preservation Law are certain amendments to the New York City Zoning Resolution which permit the transfer of unused development rights over landmark properties located in certain high density areas of the city to other nearby sites. (Zoning Resolution, §§ 74-79–74-793.)

Grand Central Terminal is unquestionably one of New York City's best known buildings. Along with the Empire State Building and the Statute of Liberty, the image of its facade symbolizes New York City for millions of visitors and residents. The terminal as a whole includes a variety of architectural and engineering elements: railroad tracks and platforms; space and facilities for marshaling and handling railroad equipment; passage-ways and ramps affording access to adjacent streets, office buildings and subway stations; and concourses for the use of passengers and pedestrians passing through the terminal. The Main Concourse, probably the terminal's most striking feature, is a large room, 120 by 375 feet, with a ceiling 125 feet high at its apex.

From its formal opening to the public in 1913 (as a replacement for the "Grand Central Depot" built by Cornelius Vanderbilt in 1871) the terminal has been recognized not only for its architecture, but as a superb example of comprehensive urban design. The complete submergence of all the tracks and a double level track system not only resulted in the accommodation of more trains without the acquisition of more land, but permitted construction of revenue-producing buildings on air rights over the railroad tracks and the development of Park Avenue as one of this Nation's most prestigious residential communities. (See Fitch and Waite, Grand Central Terminal and Rockefeller Center: A Historical Critical Estimate of Their Significance, published by the New York State Parks and Recreation Division for Historic Preservation [1974].) Today, although somewhat neglected over the years, Grand Central Terminal still remains a splendid edifice and a major part of the cultural and architectural heritage of New York City.

On August 2, 1967, after a public hearing and over objection of plaintiff Penn Central Transportation Company ("Penn Central"), the Landmark Preservation Commission proposed the designation of Grand Central Terminal as a landmark, predicated on the following findings:

"On the basis of a careful consideration of the history, the architecture and other features of this building the [Commission] finds that Grand Central Terminal has a special character, special historical and aesthetic interest and value as part of the development, heritage and cultural characteristics of New York City.

"The Commission further finds that, among its important

qualities, Grand Central Terminal is a magnificent example of French Beaux Arts architecture; that it is one of the great buildings of America, that it represents a creative engineering solution of a very difficult problem, combined with artistic splendor; that as an American Railroad Station it is unique in quality, distinction and character; and that this building plays a significant role in the life and development of New York City."

It is worthy of note, in such connection, that the Amtrak Improvement Act of 1974 (88 US Stat 1526) in accordance with the congressional declaration that it is national policy to preserve historic sites, seeks to encourage the preservation of passenger railroad terminals of special significance and architectural quality, such as Grand Central Terminal, by authorizing the Secretary of Transportation to provide them with financial and other assistance. (US Code, tit 49, § 1653.)

Plaintiff Penn Central (including, for the purposes hereof, its subsidiaries, plaintiffs The New York and Harlem Railroad Company and The 51st Street Realty Corporation) is the successor to the New York Central Railroad Company and the Pennsylvania Railroad. Plaintiff UGP Properties, Inc. ("UGP"), which was incorporated after the landmark designation here in issue, is a wholly-owned subsidiary of a British company.

Penn Central's losses over the last several years brought it to insolvency and bankruptcy. In order to minimize such losses and provide offsetting revenues, it entered into a lease with UGP in January, 1968, pursuant to which UGP was to erect a tower exceeding 50 stories over the terminal. UGP undertook to pay to Penn Central $1,000,000 per year during construction and thereafter an amount that was guaranteed to equal not less than $3,000,000 annually. In addition, UGP assumed a portion of Penn Central's real estate taxes estimated at $578,500. These rental payments were to be offset in part by the elimination of approximately $700,000 to $1,000,-000 in net rents presently received from concessionaires whose space would be occupied by the proposed new building. Commencing in July, 1968, plaintiffs submitted several building designs prepared by the architectural firm of Marcel Breuer & Associates to the Landmarks Commission (called Breuer I, Breuer II and Breuer II Revised) and requested an appropriate certificate (of no exterior effect or of appropriateness). Plaintiffs appear to have indicated a preference for Breuer II

Revised, which would have preserved the terminal's Main Concourse, but not its famous south facade. On August 26, 1969, a certificate of appropriateness was denied.

Since Grand Central Terminal receives partial real estate tax exemption (Real Property Tax Law, § 489-ff), no further administrative remedy, in the form of relief on the ground of economic hardship, was available to it. (Administrative Code, § 207-8.0.) The instant action, seeking declaratory and injunctive relief from the Landmarks Law, on its face and as applied, as well as compensation for the temporary taking (between the landmark designation and its expected judicial invalidation), was commenced. The trial court severed the cause of action for damages and, as above indicated, entered judgment declaring the Landmarks Law, as applied to plaintiffs, unconstitutional and permanently enjoined defendants from acting thereunder to prevent the construction of a lawful improvement on the terminal site. For the reasons hereinbelow stated, such determination should be reversed.

Although the apparent basis for the Trial Judge's decision is the found presence of "such elements as economic hardship, lack of compensatory alternative to alleviate economic hardship, inadequacy of relief by tax rebate, etc., etc.", the rationale would seem to be stated in the penultimate paragraph of his opinion: "The point of decision here is that the authorities empowered to make the designation may do so but only at the expense of those who will ultimately have to bear the cost, the taxpayers."

Such language suggests (in accordance with the interpretation by the court below of the holding in *Lutheran Church in Amer. v City of New York,* 35 NY2d 121, *supra)* that any regulation of private property to protect landmark values constitutes a compensable taking. Such holding would surely, as the *amicus* brief submitted hereon states, "eviscerate New York's Landmarks Preservation Law."

While the line between a compensable "taking" and a noncompensable "regulation" is sometimes difficult to discern, it nevertheless exists. (See, generally, Sax, Takings And The Police Power, 74 Yale LJ 36.)

In *Matter of Trustees of Sailors' Snug Harbor v Platt* (29 AD2d 376, 377, *supra)* we upheld the validity of the Landmarks Preservation Law as "the right, within proper limitations, of the State to place restrictions on the use to be made by an owner of his own property for the cultural and aesthetic

benefit of the community". And the Court of Appeals concluded that we were "correct in refusing to declare the entire law unconstitutional on its face." *(Lutheran Church in Amer. v City of New York,* 35 NY2d 121, 131, *supra.)*

The sole question to be decided, then, is whether plaintiffs have satisfactorily established that the law, as applied to them in this case, imposes such a burden as to constitute a compensable taking. Put another way, while the exercise of the police power to regulate the private use of property is not unlimited, it is for the one attacking such regulation in any given case to establish that the line separating valid regulation from confiscation has been breached.

In reaching such determination, consideration must be given to the importance of the regulation to the public good, the reasonableness of the regulation in achieving such end and the effect of the regulation on the economic viability of the parcel involved. *(Goldblatt v Hempstead,* 369 US 590.) We believe the first two requirements are met by the clearly stated purpose of the Landmarks Preservation Law and the unavailability of any reasonable alternative (short of condemnation) for the preservation of a landmark.

The remaining issue is the economic impact of the law on the particular parcel. In *Lutheran Church in Amer. v City of New York* (35 NY2d 121, *supra),* the court dealt with a landmark devoted to a charitable use. Adopting a concept first enunciated by this court *(Matter of Trustees of Sailors' Snug Harbor v Platt,* 29 AD2d 376, *supra)* it applied, as the standard: does the designation "prevent or seriously interfere with the carrying out of the charitable purpose"? (35 NY2d 121, 131, *supra.)*

In the instant case, the landmark parcel is not devoted to a charitable purpose; and no claim is made that it cannot be used for its prime function—as a railroad terminal. Accordingly, (and as *Lutheran* implied), the test to be applied is the same as in zoning cases, i. e.: have the plaintiffs demonstrated that the regulation in issue deprives them of all reasonable beneficial use of their property? (Cf. *Williams v Town of Oyster Bay,* 32 NY2d 78; *Adamo v Town of Babylon,* 28 NY2d 982; *Salamar Bldrs. Corp. v Tuttle,* 29 NY2d 221.)

Plaintiffs' burden, in such connection, is to establish that they are *incapable* of obtaining a reasonable return from Grand Central Terminal operations, not that they are not receiving it. (Cf. *Salamar Bldrs. Corp. v Tuttle,* 29 NY2d 221,

*supra; Stevens v Town of Huntington,* 20 NY2d 352; *Arverne Bay Constr. Co. v Thatcher,* 278 NY 222.) In our view, such burden has not been met.

To support the claim that it is actually sustaining a loss from terminal operations, Penn Central submitted a "Statement of Revenues and Costs" for the years 1969 and 1971. These statements, which were prepared for the instant litigation, improperly attribute a considerable amount of railroad operating expenses (and some taxes) to their real estate operations. For example, the expense items included "Station Master and Staff", "Information Clerks" and "Gate Usher". Such huge cost items (for 1971) as "maintenance, repairs and service plant operation" ($1,141,679), "cleaning" ($632,753), "policing" ($438,566), "materials and supplies" ($69,692), and "utilities" ($660,710) were related to the entire terminal operation and not segregated as between the railroad and real estate portions thereof.

Moreover, and to compound the error, no rental value whatsoever was imputed to the vast space in the terminal devoted to railroad purposes. (Cf. *Matter of Seagram & Sons v Tax Comm. of City of N. Y.,* 14 NY2d 314.) Since Penn Central is in the passenger railroad business it, of necessity, must have a terminal (including trackage, platforms, concourse, waiting rooms, ramps, ticket windows and public amenities) for such service. The reasonable rental value of such space cannot properly be omitted from any meaningful analysis of the property's capacity to yield a reasonable return.

Obviously, if the entire expense of operating a railroad terminal is offset only by nonrailroad rents generated by the commercial and concession use thereof, even the most profitable terminal will show a "deficit".

Additionally, on the record before us, plaintiffs have failed satisfactorily to show: (a) an inability to increase the terminal's commercial income by transforming vacant or underutilized space to revenue-producing use; or (b) that unused development rights over the terminal could not have been profitably transferred to one or more nearby sites (see New York City Zoning Resolution, § 74-79 *et seq.);* or (c) that Penn Central's agreements with the Metropolitan Transportation Authority and the Connecticut Transportation Authority provide a basis for invalidating the terminal's landmark designation.

Finally, the assertion that the Landmarks Preservation Law

unconstitutionally discriminates against Penn Central because, as the recipient of partial tax exemption, it is ineligible for statutory hardship relief, has already been disposed of by us. On an analogous claim in a comparable situation we hold "that this does not render the statute unconstitutional. It must be interpreted as giving power to the commission to provide relief in the situation covered by the statute, but not restricting the court from doing so in others." *(Matter of Trustees of Sailors' Snug Harbor v Platt,* 29 AD2d 376, 378, *supra.)*

To summarize, in view of the nationwide "burgeoning awareness that our heritage and culture are treasured national assets" *(Maher v City of New Orleans,* 516 F2d 1051, 1060), New York City's Landmarks Preservation Law is a valid exercise of its police power. The need to preserve structures worthy of landmark status is beyond dispute; and the propriety of the landmark designation accorded Grand Central Terminal is essentially unchallenged.

Plaintiffs' burden of proving the statute unconstitutional, as applied to them, is exceedingly heavy (cf. *I. L. F. Y. Co. v City Rent & Rehabilitation Administration,* 11 NY2d 480; *Wasmuth v Allen,* 14 NY2d 391); and, on the instant record, has not been met. At best, they have shown that they have been deprived of the property's most profitable use. But that is not the constitutional test. *(Goldblatt v Hempstead,* 369 US 590, *supra; United States v Central Eureka Min. Co.,* 357 US 155.)

The validity of the Landmarks Preservation Law, as applied to Grand Central Terminal, does not depend on a showing that the landmark parcel will be undiminished in any degree by the regulation's restrictions; only that it will not "deprive the individual property owner of 'all beneficial use of his property' ". *(Salamar Bldrs. Corp. v Tuttle,* 29 NY2d 221, 225, *supra.)*

In short, "[p]laintiffs have shown hardship but not confiscation." *(Mary Chess, Inc. v City of Glen Cove,* 18 NY2d 205, 210.) But such hardship, in the proper exercise of the city's police power, must be subordinated to the public weal, since such regulatory authority is not only "the least limitable of all the powers of government" *(Matter of Engelsher v Jacobs,* 5 NY2d 370, 373, cert den 360 US 902), but it "is not to be limited to guarding the physical or material interests of the citizen. His moral, intellectual and spiritual needs may also be

considered. The eagle is preserved, not for its use but for its beauty." *(Barrett v State of New York* 220 NY 423, 428.)

In light of the foregoing, the order and judgment of Supreme Court, New York County (SAYPOL, J.) entered, respectively, on January 21, 1975 and February 4, 1975, and all findings of fact and declarations of law inconsistent herewith, should be reversed, on the law and the facts, said order, judgment and findings vacated, and judgment entered declaring that plaintiffs have failed to establish that the New York City Landmarks Preservation Law is unconstitutional as applied to them, with costs.

Settle order on notice providing, *inter alia,* for new findings of fact consistent herewith.

LUPIANO, J. (dissenting). The historical, aesthetic and cultural significance of Grand Central Terminal is not disputed. Similarly, the contribution of the terminal to the uniqueness of New York City is not subject to polemics. Thus, the designation of Grand Central Terminal as a landmark under the Landmarks Law of New York City is easily countenanced. However, the sole issue to be decided on this appeal is, as aptly phrased by Justice MURPHY: "whether plaintiffs have satisfactorily established that the law, as applied to them in this case, imposes such a burden as to constitute a compensable taking". Such issue narrows down to the impact of the Landmarks Preservation Law on the particular parcel.

Plaintiff Penn Central Transportation Company ("Penn Central") has a 300-year lease for the terminal. Plaintiff The New York and Harlem Railroad Company is 95% owned by the trustees of Penn Central and is the owner of the fee. The 51st Street Realty Corporation is also a subsidiary of the Penn Central. Subsequent to the designation of the terminal as a landmark, agreements were entered into between Penn Central and UGP Properties, Inc. ("UGP") under date of January 22, 1968, whereby UGP was to erect an office building, in keeping with applicable zoning laws, in and above that part of the terminal space now occupied by the waiting room and shops along 42nd Street. UGP engaged the renowned firm of Marcel Breuer & Associates to prepare architectural designs. That firm, winner of many awards for architectural distinction (e.g., awards for the Whitney Museum and the Housing and Urban Development Headquarters Building in Washington, D. C.), designed a high-quality building in compliance with the zoning laws which would not alter the Main Con-

course or any other part of the terminal actually used in railroad operations, would provide ample access for pedestrians and, most significantly, would preserve the facade of the terminal building (Breuer Plan I). In providing for office building space rising above the present terminal frontage on 42nd Street and set back some 30 feet from the facade of the present building, this plan constituted a present-day application of a principle which had been embodied in the *original* plans for the present terminal building. The original plans called for an office building to be erected over the present facade in essentially the same location as is proposed in Breuer Plan I. The difference is that, in keeping with current building capabilities and practices, the Breuer I design calls for a considerably taller building of more modern design. The removal of certain shops and advertising signs on 42nd Street and the creation of a pedestrian arcade, as envisioned by this plan, was recognized by the Landmarks Commission as considerably enhancing, "if sensitively handled * * * the exterior of Grand Central Terminal by providing a quieter and more dignified base to support the monumental columns that rise from the ramp level. Since the suggested changes in the street level entrances would unquestionably improve pedestrian access to the Terminal and to the subway, these proposals might well be acceptable as a means of perpetuating the use of the Landmark and of protecting its main exterior architectural features". However, Breuer Plan I was twice rejected by the commission on applications for a certificate of no exterior effect (Administrative Code of City of New York, § 207-5.0) and for a certificate of appropriateness (Administrative Code, § 207-6.0) respectively. The commission in response to the "applicant's claim that the Pan Am Building has already destroyed the silhouette of the south facade and that the proposed tower, with its granite facing, would either provide a better background or that one more tower could not do further damage" opined that the "great mass of the Breuer I tower right on top of the Terminal facade * * * would reduce the Landmark itself to the status of a curiosity". An alternative design which came to be known as Breuer II Revised was also submitted. The major difference between the two plans is that Breuer II Revised does not preserve the south facade of the terminal building. A certificate of appropriateness was similarly denied for Breuer II Revised.

At this point, after denial of a certificate of no exterior

effect and a certificate of appropriateness, owners of landmarks generally would have had available an important administrative remedy: an application for relief (including ultimately the lifting of the landmark restrictions) on the ground of economic hardship. Such relief is denied with respect to the terminal and its site, however, because this part of the law is so drawn as to exclude from its applicability property having partial real estate tax exemption under section 489-ff of the Real Property Tax Law, relating to commuter railroad real property (Administrative Code, § 207-8.0, subd a, par [2]). Property exempt under section 489-ff is one of the few types as to which the Landmarks Law withholds relief and the terminal is the only 489-ff property which has been designated a landmark.

As a consequence, plaintiffs commenced the instant action for declaratory judgment which resulted in a judgment of the Supreme Court, New York County (SAYPOL, J.), declaring that the Landmarks Law of the City of New York and the actions taken pursuant thereto by the Landmarks Preservation Commission as applied to Grand Central Terminal and its site: (a) constitute a taking of private property for public use without compensation; and (b) deny to plaintiffs due process of law and the equal protection of the laws. Trial Term in its memorandum decision quoted at length from the supplemental report of former Associate Judge JOHN VAN VOORHIS of our Court of Appeals, serving as Special Master in the reorganization proceedings involving The New York, New Haven and Hartford Railroad Company in the United States District Court for the District of Connecticut. The following excerpt from that report is particularly relevant: "There is, of course, a precedent for this structure in the Pan-American Building located about 200 feet to the north. Whether the opposition to its construction will succeed is not presently known, but it would seem to me, that the probabilities are in its favor. The Grand Central Station is not proposed to be removed. [citation] It is doubtful that the City could insist upon its being maintained at Penn Central's expense as a memorial to the golden age of railroading. The building, as it is, is expensive to maintain, and even under the broad scope of the police power in modern times it is doubtful that it can be so constricted without there being a taking without payment of just compensation as required by the state and federal constitutions. This is particularly true in view of the similarity and close proximity to the

Pan-Am Building which, it might be argued, could constitute discrimination denying the equal protection of the law." Also of particular relevance are the following findings of fact enunciated by Trail Term: "9. The Terminal is deteriorating at a substantial rate. The condition of the Terminal was such that repairs and maintenance work costing approximately $1,278,135 were necessary in June 1972 * * * 25. The Terminal site is a valuable location for an office building. It is in the heart of a commercial area occupied mainly by high-rise commercial structures such as office buildings and hotels * * * 31. *If construction of Breuer I had commenced in 1968, the City could have received substantially increased property taxes from commencement of construction."* (Emphasis supplied.) After further finding that the proposed venture would have been successful and that substantial sums would have accrued to the respective plaintiffs, Trial Term found: "36. For the years 1967 to 1971, the cost to Penn Central of operating the Terminal building itself, exclusive of purely railroad operations, exceeded the revenues received from concessionaires and tenants in the Terminal. 37. The net deficit to Penn Central from operating the Terminal was $1,165,470 in 1969 and $1,902,467 in 1971. 38. As of June 1, 1972, the Metropolitan Transportation Authority leased the Terminal and, together with the Connecticut Transportation Authority, receives all revenues from tenants and concessionaires in it (with the exception of any rent Penn Central would receive under its lease with UGP) and has assumed all costs of operating the Terminal. Penn Central is obligated to pay these agencies $4,500,000 a year for the next five years and $2,000,000 thereafter. The Metropolitan Transportation Authority received partial reimbursement for these costs from the City."

In light of the agreement which Penn Central found necessary to make with the MTA and CTA and of the maintenance and operating expenses of the terminal far exceeding actual revenues therefrom, it is averred that the denial of the opportunity to profit from the proposed development leaves Penn Central in a position where it cannot make any return on the terminal. Put another way, it is plaintiffs' contention that the application of the Landmarks Law to this parcel in the manner described above, effectively deprives them of the reasonable beneficial use of their property and thus amounts to a taking. It is aptly observed in *Lutheran Church in Amer. v City of New York* (35 NY2d 121, 131) that "[t]he landmark

preservation problem has received considerable comment the net effect of which is general agreement that attempts to designate individual landmarks in high economic development areas is fraught with trouble (see, especially, Costonis, The Chicago Plan: Incentive Zoning And The Preservation of Urban Landmarks, 85 Harv. L. Rev. 574; Wolf, The Landmark Problem in New York, 22 Intramural L. Rev. of N. Y. U. 99).". Although title and use remain in the record owner, *Lutheran Church (supra)* recognized that in a particular case the Landmarks Law may operate to so severely restrict free use as to be confiscatory. Essentially this is the manner in which Trial Term viewed the problem presented by the instant action.

The majority cite specific instances in which plaintiffs are alleged to have erred in attempting to carry the burden of proving a net operating deficit. First, it is asserted that the "Statement of Revenues and Costs" for the years 1969 and 1971 improperly attribute a considerable amount of railroad operating expenses to their real estate operations. Certain substantial cost items for 1971, such as "maintenance, repairs and service plant operation", "cleaning", "policing", "materials and supplies", and "utilities", are criticized for being presented as related to the entire terminal operation rather than segregated as between the railroad and real estate portions thereof. Patently, the tenants and concessionaires who provide the gross revenues of the terminal are there because the terminal is an active railroad station and provides a nexus with public transportation via subway and bus, thus insuring the daily passage of thousands of people. Pragmatically, these tenants and concessionaires can be attracted and retained if the building is operated as a railroad station and is maintained, cleaned, repaired and policed in all its parts. There is, therefore, a basis for claiming that the expense of operating and maintaining the building is a proper expense in ascertaining the profitability or unprofitability of its operation. The insubstantial nature of the criticisms of the "Statement of Revenues and Costs" is evident because excluding all items the defendants, the City of New York and the Landmarks Preservation Commission, claim should be excluded only reduces the deficit from $1,902,467 to $1,089,672. That alone serves to establish the economic burden borne by the terminal. Further, though difficult to apportion, it may not be gainsaid that the value of the "real estate" aspect of the terminal is dependent upon the maintenance of the terminal

as an area which will be visited for purposes other than transportation.

It is next claimed that plaintiffs' failure to impute a rental value to the vast space in the terminal devoted to railroad purposes is an error vitiating plaintiffs' analysis of the property's capacity to yield a reasonable return. As to this contention, the plain answer is that the defendants' reliance on *Matter of Seagram & Sons v Tax Comm. of City of N. Y.* (14 NY2d 314) is misplaced. This case dealt not with income from a building, but with the determination of its appraisal value on the capitalization-of-rents method. Obviously, under those circumstances, rent had to be imputed to owner-occupied space in order to have something to capitalize for that portion of the building. That, of course, is not the case here which is concerned with whether the owner is making any return from his use of his property. Indeed, the Landmarks Law itself in defining "reasonable return" states that for such purposes "[n]et annual return shall be the amount by which the *earned income* yielded by the improvement parcel during a test year exceeds the operating expenses of such parcel during such year" (Administrative Code, § 207-1.0, subd v, par [3], cl [a]; emphasis supplied). As a matter of economic analysis, the argument treats the terminal as if someone had made a gift of it to Penn Central. The fact is that Penn Central paid its own money for the terminal and to the extent it has been "saved" money for terminal rental, it has lost the interest it would have made if it had never built the terminal or had sold it. These figures of rent and interest on the value of the property are economic equivalents (see *La Porte v State of New York,* 6 NY2d 1, 7, app dsmd 361 US 116; *Albany Country Club v State of New York,* 37 Misc 2d 134, 144, mod on other grounds 19 AD2d 199, affd 13 NY2d 1085). Further, it has been held that the imputation of rent does not create income from property as the term is defined by the Internal Revenue Code *(Harper v Granger,* 99 F Supp 216). In passing, note is taken of plaintiffs' point that it is ironic to have the argument made in this case that the present terminal should be assigned an enormous rental value because of the rental values for comparable space in mid-Manhattan. Rental values are high in that area in the context of the owners' freedom within the zoning laws to develop their property in profitable ways. At issue here is the application of the Landmarks Law in such manner as to deprive the terminal of such value. It may well be

argued that no one would pay substantial rentals for a lease of the terminal when told that the *only* use to which he can put it is an unprofitable railroading use. In this sense the value which defendants would have the court attribute to the property is precisely the value that they have taken away from it.

Next, it is maintained that plaintiffs have failed to satisfactorily show an inability to increase the terminal's commercial income by transferring vacant or under-utilized space to revenue-producing use. In this context it appears that Penn Central has been assiduous in attempting to increase its terminal income. Indeed, the commercialization of the terminal had reached such a point that one of the things discussed in the proceedings before the Landmarks Commission was the desirability of eliminating some of the concessions which have disfigured the building. The simple assertion that there is room for development of additional office space, stores or recreational facilities is highly speculative. As to existing leases, there is nothing to suggest that they were not negotiated at arm's length. As to additional development, it is worthy of note that a proposed bowling alley in place of the waiting room failed of approval by the Public Service Commission. Also, a proposed mall failed of accomplishment because of its impingement upon trackage.

Defendants next assert that the claimed hardship based on deferred maintenance expenses, attributable to the Landmarks Law provision (Administrative Code, § 207-10.0) requiring Penn Central to maintain the landmark is spurious. This assertion is seemingly premised on the argument that the Landmarks Law mandates no more than that required by ordinary prudent management for the preservation of the investment. Maintenance is a prerogative of management. To transform that prerogative into a duty is to clearly lessen Penn Central's estate. It is as though a lien is asserted against the property in the amount necessary to maintain the terminal and it mandates expenditures whether or not justified by the operating statement. Otherwise stated, ownership entitles one to destroy as well as to preserve. Subject to the law of nuisance, *inter alia,* the vehicle of destruction may be neglect. To require maintenance or improvements may be an idea whose time has come, but it may not be required solely of landmarks, and not in the context of additional burdens or restrictions upon the parcel which on a pragmatic economic

and financial basis cannot be complied with. Though not here in issue, notice may be taken of the fact that criminal penalties attach to the failure to maintain a landmark.

It is further asserted by defendants that the agreements with the MTA and the CTA referred to above, were improperly found by Trial Term to impose a loss in that Penn Central must pay additional sums to those agencies. Review of the historical background of those agreements impels the conclusion that defendants' contention is without merit. Approximately two years prior to any agreement with the MTA, Penn Central acquired all the assets of the New Haven Railroad, specifically including all the New Haven's interest in the off-terminal (Park Avenue) properties. For this interest Penn Central was charged more than $28,000,000. At the same time, Penn Central became responsible for all the operations and operating deficits of the New Haven. Therefore, when Penn Central and the MTA negotiated their agreements, the New Haven was in essence a mere corporate shell. There were no assets of the New Haven to which the MTA could "succeed" and the MTA in fact acquired nothing from the New Haven. Defendants, though acknowledging that all revenue inures to the benefit of the MTA and that all costs are borne by the MTA, aver that the $2,000,000 credit against expenses incurred is in reality a sum due the MTA as the successor in interest to the New Haven. During the time when the New Haven still held an interest in the off-terminal properties and their revenues, these revenues had been applied towards offsetting the operating deficits of the terminal and, if any excess remained, the New Haven asserted a claim to a share of the excess. It was thought equitable for Penn Central to contribute towards the operating deficits of the terminal an amount roughly equivalent to the part of the off-terminal revenues which had formerly been applied towards New Haven's share of the terminal expenses. Penn Central's acquisition of the part of the off-terminal revenues which was "not excess" was accompanied by its assumption of the very expenses (formerly the obligations of the New Haven) against which the nonexcess revenues had been applied. No benefit was derived from the simultaneous acquisition of a debit and a credit in equal amounts. Thus, the credit of $2,000,000 provided by Penn Central to the MTA did not come out of the assets of the New Haven to which the MTA had succeeded and the agreements between Penn Central and the MTA

delineate that this credit is to come out of Penn Central's own assets and is specifically applied towards operating expenses of the terminal.

The other credit of $2.5 million per year for five years required to be provided by Penn Central in connection with the operation for MTA's account of the Harlem-Hudson Division is not related to the terminal. The operating agreements were not entered into for the benefit of Penn Central, but for the purpose of maintaining commuter service. While Penn Central may have been able to meet operating deficits, it may also have been able to discontinue commuter service. The $2.5 million credit was the price it paid for withdrawal from commuter service. Viewed in this context, the credit is chargeable not to the operation of the terminal, but to the Penn Central itself. However, this does not alter the fact that the several agreements leave Penn Central with no possible source of return from the terminal, save development rights.

The majority view the plaintiffs as having failed to satisfactorily show that unused development rights over the terminal could not have been profitably transferred to one or more nearby sites (see New York City Zoning Resolution, § 74-79 *et seq.*). The transfer resolutions authorize the City Planning Commission to grant special permits, if certain conditions are met, allowing the transfer of development rights from a landmark site to adjacent sites. As originally enacted, they neither provided compensation nor significantly mitigated plaintiffs' harm. Defendants acknowledged that development rights are not *ipso facto* equated with compensation when the zoning resolution was amended in 1969 to expand the number of sites that could receive transfers of development rights from the terminal site. Moreover, as defendants themselves note, the process of transfer is fraught with obstacles. The City Planning Commission and the Board of Estimate must approve. Neighbors may resort to the courts to protest the erection in their vicinity of a structure which does not comport with the zoning resolution. For these and numerous other reasons it is difficult to assign a monetary value to the transfer rights. However, not content with merely asserting the general value of transfer rights, defendants detail the economic benefit to be derived from a transfer to the Biltmore Hotel site. This, of course, requires the demolition of the Biltmore Hotel, a viable profit-making entity and ignores the fact that the vast square footage could not be transferred to

any adjacent site, unless the Biltmore site was to be occupied by a 103-story structure. In the context of this discussion, it ill-behooves defendants to in effect control the deployment of the Penn Central's financial resources and usurp its management prerogative. In light of the substantial costs that may attend the transfer of development rights because the landmark owner must submit a program for continuing maintenance of the landmark as part of his application for the special permit, the value of the development rights are less attractive.

It is, therefore, concluded on the record herein that plaintiffs have sustained their burden of demonstrating that the terminal site, as restricted, is incapable of producing a reasonable economic return. Concededly the operation of the terminal represents an economic hardship. Conjecture that Penn Central could have "done better" may not operate as a talisman in the resolution of this matter. It is only required that Penn Central do the best it can. The possible transfer of development rights cannot be viewed under the circumstances herein as offsetting the restrictions placed on the terminal site. The benefits to both the city and the citizenry to be derived from the designation of the terminal as a landmark are self-evident. Yet in the manner of its application as delineated above, lies the inequity of this particular case. The terminal is to be preserved in its pristine state for the benefit of all and the bill for this is presented solely to Penn Central. Assuming the terminal is and represents all that defendants claim (an assumption easily indulged in), the relevant considerations and circumstances may well warrant resort to the power of eminent domain as an appropriate solution. If for cogent reasons resort to such power is not feasible, defendants may have to forego this particular objective. In this connection, it should be noted that Breuer I appears to be more suited to a compromise of the rival interests of defendants and of plaintiffs. Further, if the power of eminent domain is deemed here inappropriate, society is left with an inchoate right.

At this point the following lengthy excerpt from the Court of Appeals opinion in *Forster v Scott* (136 NY 577, 583–585 [1893]) is most apt:

"The constitutional guarantees against the appropriation of private property for public use, except upon just compensation, as well as that against depriving the owner of its enjoy-

ment and possession without due process of law, have been the subject of much judicial discussion in the manifold aspects in which the questions have been presented in the numerous cases * * * The validity of a law is to be determined by its purpose and its reasonable and practical effect and operation, though enacted under the guise of some general power, which the legislature may lawfully exercise, but which may be and frequently is used in such a manner as to encroach, by design or otherwise, upon the positive restraints of the Constitution. What the legislature cannot do directly, it cannot do indirectly, as the Constitution guards as effectively against insidious approaches as an open and direct attack. Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the Constitution. All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner. Though the police and other powers of government may sometimes incidentally affect property rights, according to established usages and recognized principles familiar to courts, yet even these powers are not without limitations, as they can be exercised only to promote the public good, and are always subject to judicial scrutiny. [Citations omitted.]

"As the plaintiff in the case at bar was virtually deprived of the right to build upon his lot by the statute in question, and as this circumstance obviously impaired its value and interfered with his power of disposition, it was to that extent void as to him, and created no encumbrance upon it."

Manifestly, the competing meritorious interests of the city and the Landmarks Preservation Commission in seeking to preserve the historical, aesthetic and cultural heritage represented by Grand Central Terminal and the interest of Penn Central as owner in the free use of its property unburdened by restrictions imposed by the former under circumstances and in such manner as to be confiscatory in nature, must be

reconciled. It is submitted that given the present economic conditions prevalent in New York City and, indeed in the United States, given the financial situation of Penn Central with due regard for the reasonable efforts on the part of management to obtain an adequate return on the property at issue, and given the grandeur of the terminal, somewhat faded in the physical sense but fully vital from an historical and cultural perspective, Breuer I represented a patently good faith effort to do homage to the terminal within the ambit of its landmark designation, and at the same time to recognize the prerogative of private ownership and the economic necessities of this commercial parcel.

In the *amicus curiae* brief submitted on behalf of the Committee to Save Grand Central Station, *et al.,* it is stated that "[r]egulation for the purpose of the preservation of * * * [landmarks] has been upheld in all states where the matter has been tested in court", citing in support of this proposition the following: *City of New Orleans v Levy* (223 La 14); Opinion of the Justices to the Senate (333 Mass 773); Opinion of the Justices to the Senate (333 Mass 783); *City of Santa Fe v Gamble-Skogmo* (73 NM 410); *Town of Deering ex rel. Bittenbender v Tibbetts* (105 NH 481); *Rebman v City of Springfield* (111 Ill App 2d 430); *Bohannan v City of San Diego* (30 Cal App 3d 416). A reading of these cases indicates that, with one exception, each case was concerned with the preservation of a district, not an individual parcel. This is so analogous to zoning that the statutory scheme is oft referred to as zoning. The one exception was a prohibition against the erection of any building within ¼ mile of the town common unless the plans were approved *(Town of Deering ex rel. Bittenbender v Tibbetts, supra)*. Again, hardly the sort of taking here present. We refer again to the Court of Appeals decision in *Lutheran Church in Amer. v City of New York* (35 NY2d 121, *supra),* wherein it was observed in the able opinion, per GABRIELLI, J. that zoning regulation is different than, and not to be equated with, landmarks preservation. Nevertheless, the court proceeded to demonstrate that even zoning is void if confiscatory. Further, it is confiscatory if it may fairly be stated that the regulation serves to add property remaining in private hands to the government's resources. Citing *Forster v Scott* (136 NY 577, *supra),* the court also noted that a statute which affects the free use and enjoyment of property or the power of disposition at the will of the owner is "obnoxious to the

restraints of the Constitution" *(Lutheran Church in Amer. v City of New York, supra,* p 130). "What has occurred here, however, where the commission is attempting to force plaintiff to retain its property as is, *without any sort of relief* or adequate compensation, is nothing short of a naked taking" *(Lutheran Church in Amer. v City of New York, supra,* p 132; emphasis supplied). It thus appears that Mr. Justice SAYPOL correctly analyzed the opinion of the Court of Appeals and that severe criticism of the Justice in this respect by defendants is unwarranted. Of particular note is the fact that in *Lutheran Church,* the landowner wished to demolish the mansion which had been designated a landmark and to accomplish this purpose it was necessary to have the "landmark designation" itself removed. It was "uncontested that the existing building [was] totally inadequate for [the landowner's] legitimate needs and must be replaced if [the landowner] is to be able freely and economically to use the premises especially as it appears that adjoining structures have been integrated with [the landowner's] operation" *(Lutheran Church in Amer. v City of New York, supra,* p 132). However, the declaratory judgment action initiated by plaintiffs herein has its inception not in a desire to demolish the landmark, but rather to alter it; that is, to use it in a manner which will insure a reasonable economic return while preserving the landmark in a feasible and consonant manner. To phrase it another way: plaintiffs desire to build an office tower *over* the landmark and not to remove the landmark and replace it with such office tower. Consequently, the declaratory relief afforded by the Supreme Court must be viewed as not removing the "landmark designation" from the terminal, but rather perceived as holding that the manner of applying such designation as above delineated, constitutes a taking of plaintiffs' private property for public use without just compensation. It is beyond cavil that if defendants, especially the Landmarks Preservation Commission, acted favorably in respect of any of the plaintiffs' applications seeking to construct the tower, the instant action would not have been maintained. By virtue of the fact that plaintiffs retained an outstanding architect firm and even submitted Breuer I which retains the famed south facade of the terminal, their good faith in coming to terms with the landmark designation has been exhibited. The presence of the Pan Am Building and the fact that the original plans for the present terminal envisioned an office tower over such terminal militate in persuasive fashion against the de-

fendants' intransigent position. In this context, such rigid application of the Landmarks Law designation may well be self-defeating. Self-defeating not only because it calls into question the propriety of such law, but also because the individuals who designed, built, indeed underwrote the great structures now deemed worthy of designation as landmark, undoubtedly did so for a variety of reasons, among which was their intention to profit therefrom. Is it not reasonable to assume that if the result of structural distinctiveness is to be a lessening of the entrepreneurial estate, there may well be no structures to designate as landmarks in the years to come?

Defendants claim that Trial Term erred in declaring that the Landmarks Law *as applied* to plaintiffs denies them the equal protection of the laws. It will be recalled that Penn Central is precluded from seeking relief available to others because of its receipt of a partial real estate tax exemption. The statutory scheme, without explanation therefor, treats differently three classes of landmark owners. Penn Central is relegated to that category which cannot obtain relief from the Landmarks Law. Moreover, as demonstrated by plaintiffs, there is neither a common thread nor a common sense segregation of classes of property. It is this feature which denies to plaintiffs the equal protection of the laws. The power of classification cannot be arbitrarily exercised. The distinctions made must have some reasonable basis *(Rosenthal v New York,* 226 US 260; cf. *Matter of Brown v Board of Trustees of Town of Hamptonburg, School Dist. No. 4,* 303 NY 484).

The remaining contentions raised by defendants have been considered and found to be without merit. Accordingly, the order and judgment of the Supreme Court, New York County (SAYPOL, J.), entered respectively on January 21, 1975 and February 4, 1975 declaring that the Landmarks Law of New York City and the actions taken pursuant thereto by the Landmarks Preservation Commission as *heretofore* applied to Grand Central Terminal and its site: (a) constitute a taking of private property for public use without compensation; and (b) deny to plaintiffs due process of law and the equal protection of the laws, should be affirmed, with costs and disbursements.

STEVENS, P. J., and KUPFERMAN, J., concur with MURPHY, J.; MARKEWICH and LUPIANO, JJ., dissent in an opinion by LUPIANO, J.

Order and judgment, Supreme Court, New York County,

entered on January 21, 1975 and February 4, 1975, and all findings of fact and declarations of law inconsistent with the opinion of this court, reversed, on the law and the facts, said order, judgment and findings vacated, and judgment directed to be entered declaring that plaintiffs have failed to establish that the New York City Landmarks Preservation Law is unconstitutional as applied to them. Appellants shall recover of respondents $60 costs and disbursements of these appeals.

Settle order on notice providing, *inter alia,* for new findings of fact consistent with the opinion of this court.