558 S.W.2d 262 (1977)
Jerry DEMPSEY, Sedge Mead, Judy Shehan and Sue White as Individuals and Officers of the Soulard Restoration Group, and John B. Kelly and Janice Lee Kelly, Plaintiffs-Appellants,
v.
BOYS' CLUB OF the CITY OF ST. LOUIS, INC., a corporation, the Board of Adjustment of the City of St. Louis and Individual Members Martin Beffa, Charles K. Baker, Gregory Gunn and Joseph Failoni, Defendants-Respondents,
Lafayette Square Restoration Committee, Incorporated, Amicus Curiae.
No. 38488.
Missouri Court of Appeals, St. Louis District, Division Four.
August 30, 1977.
Motion for Rehearing and/or Transfer Denied November 14, 1977.
*263 Schmitz & Fischer, J. Peter Schmitz, St. Louis, for plaintiffs-appellants.
London, Greenberg & Fleming, C. John Pleban, St. Louis, for Boys' Club of the City of St. Louis, Inc.
Jack L. Koehr, City Counselor, Edward M. Peek, Assoc. City Counselor, St. Louis, for Board of Adjustment.
Peter J. Wunderlich, St. Louis, for amicus curiae.
NORWIN D. HOUSER, Special Judge.
Certiorari to review the proceedings of the Board of Adjustment of the City of St. Louis granting permits for the demolition of nine buildings located in an area of the city governed by Soulard Historic District Ordinance No. 57078 and its enabling Ordinance No. 56100. These buildings were acquired by respondent Boys' Club of St. Louis, Inc. with the intention of demolishing them for the purpose of expanding its adjacent athletic field. The circuit court granted its writ of certiorari and issued an order restraining demolition. After a hearing the court entered judgment affirming the decision of the board of adjustment and dissolving the restraining order. From this judgment plaintiffs have appealed. Plaintiffs are property owners residing within the district and members and officers of a voluntary organization called Soulard Restoration Group.
Point I of appellants' brief presents the question whether the decision of the board of adjustment granting demolition permits *264 is supported by competent and substantial evidence upon the whole record.
Carl Nicholoff, a registered architect, surveyed the whole area with a surveyor's level, and in so doing observed the exterior of the buildings in question. Since he did not see the interior of the buildings he could not testify as to their condition inside but he thought you could tell the interior condition of a building "pretty well by the exterior." He testified that the buildings owned by Boys' Club are "a detriment . . really in sad shape . . . very questionable buildings structurally, aesthetically. . . not one is worth talking about. . . there's nothing to preserve . . they have outlived their usefulness . . they do need work, most of them . . . in a derelict condition . . . a pretty scummy job . . . I drove around here and it looks like no man's land. It looks like East Harlem." He was particularly critical of the building located at 1000 Victor Street, stating that it is ready to cave in; that it is really a hazard . . . a detriment to human lives and safety; big hunks of the wall have been falling out; no effort has been made to repair it; a wooden porch has a post swaying in the wind, and the downspouts are connected to nothing. His testimony with reference to the property at 1000 Victor Street, however, was extraneous to the issue because that property is not owned by Boys' Club. As to the buildings owned by Boys' Club he testified that it would "take a lot of gutting and a lot of money to bring them up to a liveable shape, such as plumbing, electrical wiring, heating, air conditioning and so on and all the things you would want to rehabilitate and in preserving it. You don't do it for nothing, you know." Although a basis for his knowledge concerning the financial condition of Boys' Club was not shown he volunteered the opinion that Boys' Club could not afford to remodel these buildings. He did not know how many rooms there are in each of the various buildings. Asked if the buildings are secured from unauthorized entry he answered, "I don't think they're secured against anything at this time."
Charles Nash, Assistant Activity Director for Boys' Club, testified that the buildings on Tenth Street "are totally wrecked inside." One day there was a fire in one. The mantles were gone. These buildings were "totally gutted . . . a total shambles . . . one is through the roof. . . really in bad shape . . . really a dangerous building . . . the building directly behind us is bowed and has a wave in it . . . this building is dangerous . . . one fire in the last building . . . was totally burned to and through the top floor and it was burned bad . . . it was totally in bad shape."
Mrs. Barbara Cash would not live in these houses or let anybody live in them; would not go in them; would be afraid to go in these old houses, which "ought to be torn down."
James Proprotnick, head of the development and design evaluation staff of the Community Development Agency testified that the staff recommended to the Landmarks and Urban Design Commission as part of its compromise plan that two of the buildings on Tenth Street, and the structures behind a building on Victor Street, be demolished but recommended that the other buildings be preserved.
There is evidence of a survey of 27 or 28 old buildings located in the district, buildings which have been or are now in the process of being restored (evidence introduced by the opponents of demolition to demonstrate that there is a growing market for this type of property). The total amount spent to buy these homes, plus the cost of improvements to date and improvements projected in the future, divided by the number of properties, showed the total cost per home to be "somewhere around" $26,000. The estimated cost of rejuvenating a single family building ranges from $14,000 to $18,000, and the cost of a 4-family property plus the cost of rejuvenation so as to make luxury apartments would be $65,000. There was testimony that four-unit apartments at Shenandoah and South Eleventh Streets rent for $175 downstairs and $150 upstairs.
*265 The board of adjustment made the following findings of fact relating to the status of the subject property:

"1008 Victor Street Located on the front portion of the lot is a 2½ story brick residence. The building is a narrow structure with three small rooms on the ground floor and separate quarters on the upper floors. It is vacant, open to unauthorized entry and the window glass is broken throughout. The interior is extensively damaged and electrical and plumbing facilities are missing. The rear porch is deteriorated.
"Located on the rear portion of the lot is a one story brick `alley house.' The exterior brick walk is deteriorated and in need of extensive maintenance.

"1010 Victor StreetLocated on the front portion of the lot is a narrow 3 story brick residence with 3 small rooms on each floor with access to the upper floors by means of a rear entrance stairs and porch. It is vacant and obviously vandalized; open to unauthorized entry; the window glass is broken throughout, the exposed wood is deteriorated; the interior is strewn with combustible material, ceiling lathes are exposed and hanging down; electrical and plumbing fixtures are missing.

"1012 VictorLocated on the front portion of the lot is a narrow 3 story brick residence. It is the same type as 1010 Victor and is vacant, vandalized, open to unauthorized entry, the front door is missing, window glass is broken out throughout; the interior is extensively damaged and cluttered with debris; the electrical and plumbing fixtures are missing and there is evidence of fire damage.
"A two story brick `alley house' on the rear of the lot is also vacant, vandalized and open to unauthorized entry; the windows are broken throughout and there is sign of a bulge in the exterior wall.

"2500-2502 South 10thThere is a 3 story brick store front type building with residential facilities on the upper floors. The building is vacant, vandalized, open to unauthorized entry; the doors are missing, windows are broken throughout, exposed wood is deteriorated and the interior of the building has been `gutted.'

"2504-06 South 10th There is a two story brick, four family flat. The building is vacant, vandalized, and open to unauthorized entry. The windows are broken throughout and doors are missing. The interior portion of the building has been `gutted.'

"2514-16 and 2518-20 South 10th Each lot contains a three story brick multiple family apartment building. In both instances the buildings are vacant, vandalized and open to unauthorized entry. The windows are broken throughout, exposed wood is deteriorated and portions of the mansard roof in the front, are missing. The interior of the buildings have been `gutted.'"
The board of adjustment made the following conclusion of law and order:
"It is the decision of this Board that in applying the standards for demolition as contained in the `Development Plan for the Soulard Historic District' to the buildings located on the seven lots which are the subject of this appeal, and bearing in mind the historical or architectural significance, if any, of each structure, each of the subject buildings are in such a state of deterioration and disrepair as to make rehabilitation impracticable.
"In view of the living space available in each and the amount of restoration and repairs that would be necessary to make these buildings habitable, the Board concludes that although rehabilitation is possible, it is impracticable under the circumstances.
"Since the facts and circumstances in each case are different, the decision in this matter should not be viewed as a precedent for future cases.
"The action of the Building Commissioner in denying the permits for demolition is hereby overruled and the permits ordered to issue."
We find no evidentiary basis for the following findings of fact: that the interior of *266 1008 Victor Street is extensively damaged, electrical and plumbing facilities are missing and the rear porch is deteriorated; that the interior of 1010 Victor Street is strewn with combustible materials, ceiling lathes are exposed and hanging down, and electrical and plumbing fixtures are missing; that the interior of 1012 Victor is extensively damaged and cluttered with debris and electrical and plumbing fixtures are missing.
Photographs of the several buildings do support the finding that doors are missing, windows are broken out and the buildings are not secured from unauthorized entry.
The generalized conclusions and unsubstantiated opinions of various witnesses that the buildings were totally wrecked, totally gutted, in total shambles, and in bad and sad shape; that they need work done on them and have outlived their usefulness; that they are structurally questionable and that it would take "a lot of gutting" and "a lot of money" to make them habitable; that plumbing, electrical wiring, heating and air conditioning would have to be installed and that this cannot be done "for nothing," etc., having gone in evidence without objection, could be considered by the board of adjustment for whatever they were worth. § 536.070(8), RSMo 1969; Williams v. Cavender, 378 S.W.2d 537[1] (Mo.1964); Crampton v. Osborn, 356 Mo. 125, 201 S.W.2d 336 (1947); Bridgeforth v. Proffitt, 490 S.W.2d 416[3] (Mo.App.1973); 30 Am.Jur.2d Evidence § 1089. Assuming that the board accorded these conclusory statements full weight and accepted them as fact, they nevertheless do not constitute competent and sufficient evidence to support a finding that the buildings are in such a state of disrepair or so badly deteriorated or structurally unsound as to make rehabilitation impracticable.
The standards for determining whether the city authorities may order demolition are prescribed in the Development Plan for the Soulard Historic District. The plan, adopted and incorporated in Ordinance No. 57078 by reference, provides that "No building or structure within the Historic District shall be demolished, and no permit shall be issued for the demolition of any such building or structure, unless the Landmarks and Urban Design Commission and the Community Development Agency both shall find that the building or structure is in such a state of deterioration and disrepair or is so unsound structurally as to make rehabilitation impracticable." [1] In order to meet constitutional objections these standards "must be interpreted to authorize demolition when the condition of the structure is such that the economics of restoration preclude the landowner from making any reasonable economic use of the property. The decision of the City authorities cannot be based simply upon a determination that it is physically possible to save the structure at an expense unwarranted by the possible use which could be made of such structure after rehabilitation." Lafayette Park Baptist Church v. Scott, et al., 553 S.W.2d 856, l. c. 862 (Mo.App.1977). In that case the board of adjustment was held to have applied an improper standard in that the board determined whether a demolition permit should issue by considering only technological feasibility and not economic feasibility. That case establishes that the Board must view the standards of impracticality established by the ordinance from an economic standpoint as well as from a technological one.[2]
The term "rehabilitation impracticable" as used in the ordinance implies something more than infeasibility of restoration because of physical condition. It contemplates *267 the broader question whether the property can be turned to use or account profitably. If so, the declared public policy of protecting the historic and cultural heritage of the city saves the property from destruction, in the absence of constitutional limitations. There is in this record no substantial evidence that it would be uneconomic to restore and rehabilitate these buildingsno evidence that the cost of restoration and rehabilitation precludes the owner from making any reasonable economic use of the properties. Boys' Club, Inc. is not entitled to a permit to demolish these buildings without making such a showing. There was no evidence that the 27 or 28 old buildings being restored, or those yielding rentals, were comparable in purchase price, original condition, square feet of floor space, and in other pertinent particulars with the properties in question, or that the cost of rehabilitating the buildings owned by Boys' Club, Inc. would be the same or substantially the same. Nor was there evidence of the amount of rental income Boys' Club, Inc. could reasonably expect after rehabilitation of these particular buildings, some of which were originally 2-family and some 4-family structures. There is no evidence of the reasonable market value of these particular buildings if offered for sale after rehabilitation. There is no evidence that Boys' Club cannot economically utilize the properties or that it is impracticable to sell or lease them,[3] or that Boys' Club is incapable of obtaining a reasonable return from the properties,[4] or that no market exists for this type of property at a reasonable price.
The stated conclusions of the board of adjustment indicate that it considered rehabilitation of the buildings not technologically feasible because of their condition of deterioration and disrepair. While the second paragraph indicates that some consideration was given to economic factors in determining impracticability, the record does not contain substantial evidence sufficient to support a finding of economic infeasibility. For these reasons the judgment of the circuit court affirming the decision of the board of adjustment cannot stand.
We realize that Boys' Club is not in the business of renting houses or apartments; that considerations of a commercial nature applicable to investors or others engaged in the rental business may be deemed inappropriate by a benevolent or humanitarian organization seeking a permit to demolish property in order to carry out and promote its chartered objectives and purposes; that to deny such a request may effectively deprive such an organization of any practical use or benefit of ownership, and that in conceivable circumstances such a denial might be considered to constitute a taking of private property for public use. We recognize that a property may turn out to be of no practical or effective use to an organization (because its only or principal commercial value is for rental purposes, an activity foreign to its operational setup), or the organization may be financially unable to rehabilitate the property within reasonable economic limitations, or the property may not be salable for an amount sufficient to recoup the organization's investment, as a result of which the enforcement of the ordinance by denying an application for demolition would for all practical purposes amount to confiscation of the property. In such case, where the building or monument is of such historic importance that it should be preserved for posterity, the public body might be empowered to acquire the property by condemnation, or a refusal to allow demolition might be accompanied by a tax credit arrangement, or other economic incentives or palliatives.[5] This ordinance makes no such provisions. These are practical problems as yet not provided for by legislation. Until such legislation is enacted *268 the only recourse of an organization finding itself in this situation may be to resort to the remedy commonly referred to as inverse condemnation.
We further observe that Boys' Club has not raised the constitutional question whether the refusal of the permit to demolish constitutes a taking of private property for public use without just compensation.[6] In this connection see Lafayette Park Baptist Church v. Scott, et al., supra.
Point II of appellants' brief relates to certain unfortunate and ill-advised statements made by two members of the board of adjustment while the hearing was in progress. One of them praised the fine work being done by the officers and supporters of Boys' Club. His remarks were susceptible of an interpretation that he was predisposed in favor of respondent Boys' Club. The other characterized the efforts of the opponents of demolition as "obstacles" to the aspirations of the Boys' Club people and implied they were interposing a "technicality" to preserve a few buildings.
Point III raises the question whether the board was properly constituted as a legal board capable of entertaining this proceeding. City Code 916.010 provides that the board of adjustment shall consist of five members, one of whom shall be a registered structural engineer of not less than ten years' professional experience. Four months prior to the date of the hearing the member of the board who was a registered structural engineer resigned, and at time of hearing he had not been replaced. The hearing was conducted by the remaining four members of the board.
In view of our holding on the first point, Points II and III need not be passed upon on this appeal. It is unlikely that the members of the board on rehearing will demonstrate bias in favor of one side or the other. It is likely and to be expected that they will accord both sides a fair, impartial, unprejudiced and unbiased hearing, and decide the matter on the law and the evidence without allowing their personal feelings or predilections to interfere with the performance of their public duties. By the time the rehearing is scheduled the Mayor of the City of St. Louis doubtless will have filled the vacancy on the board of adjustment, thus enabling the hearing to be conducted with a full complement of five board members.
In Point IV appellants contend that the court erred in dismissing Count III of their petition, in which they prayed for equitable relief. Count III alleged that Boys' Club, Inc. purchased these buildings with knowledge of the passage of Ordinance No. 57078; that when Boys' Club, Inc. purchased the buildings they were occupied as residences; that Boys' Club, Inc. evicted the occupants or encouraged or forced them to leave until all the buildings became vacant, and failed to board up the vacant houses or otherwise protect them, thereby permitting vandalism, resulting in breakage of most of the windows and further damage by the elements; that in equity Boys' Club, Inc. should not be permitted to rely on the resulting deterioration as the basis for its appeal to the board of adjustment or benefit from a decision of the board based on the resulting deterioration. Plaintiffs prayed for an order enjoining demolition based on evidence of deterioration permitted by Boys' Club in violation of law.
The court on motion dismissed Count III. In view of our holding and the necessity of remand for a rehearing this point has become moot. The equitable considerations alleged in Count III may be presented to and urged upon the board of adjustment at the rehearing.
Judgment reversed; cause remanded to the circuit court with directions to vacate *269 the order granting demolition permits and remand the cause to the Board of Adjustment of the City of St. Louis for a rehearing and for further proceedings consistent with this opinion.
SIMEONE, C. J., and ALDEN A. STOCKARD, Special Judge, concur.
NOTES
[1] Neither the Landmarks and Urban Design Commission nor the Community Development Agency made such a finding. On the contrary, the Commission by a 5-1 vote rejected the application for a building permit to wreck the buildings on the ground that the buildings were "salvageable." Upon its review the Agency recommended an alternative plan.
[2] Lafayette Park also provides that where the general impracticality standard has been resolved against demolition, the landowner may still raise the question of unconstitutional application upon proving his economic inability to rehabilitate and that no market for sale or lease at a reasonable price exists.
[3] See Maher v. City of New Orleans, 516 F.2d 1051, 1066[22] (1975); Opinion of the Justices to the Senate, 333 Mass. 773, 128 N.E.2d 557, 562[8] (1955).
[4] Penn Central Transp. Co. v. City of New York, 50 A.D.2d 265, 377 N.Y.S.2d 20, 28 (1975).
[5] Maher v. City of New Orleans, supra, 516 F.2d l. c. 1065.
[6] See First Presbyterian Church of York v. City Council of York, 360 A.2d 257 (Pa.Cmwlth.1976), wherein that was the contention, and the court applied the test "whether the refusal of the permit to demolish went so far as to preclude the use of York House for any purpose for which it was reasonably adapted; * * * that the Church, having failed to show that a sale of the property was impracticable, that commercial rental could not provide a reasonable return or that other potential uses of the property were foreclosed, had not carried its burden of proving a taking without just compensation." 360 A.2d l. c. 261.